**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **4:17-cr-00131-KOB-HNJ** |
| | ] | |
| **ANTHONY MILES YARBROUGH,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

Our Constitution provides many important protections. Among them, the Fourth Amendment's prohibition on unreasonable searches and seizures embodies a particular concern about and constitutional protection against governmental intrusion into one's home. *See generally United States v. Jones*, 565 U.S. 400, 405–07 (2012) (Scalia, J., explaining the historic roots of the Fourth Amendment in property rights and common law trespass); *Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable.") (quotation marks omitted). This case sets the presumption that a warrantless search of one's home is unreasonable and unconstitutional against the oft-used "protective sweep," which permits officers to search a home based upon a *reasonable* belief that it contains a person posing a danger to the officers or other people. Because the Government has not carried its burden of proving that the searching officer had a reasonable belief that defendant Anthony Miles Yarbrough's home harbored a dangerous individual, the warrantless search of his house fails to meet constitutional muster.

A grand jury indicted Mr. Yarbrough on one charge of being a felon in possession of two firearms, in violation of 18 U.S.C. § 922(g)(1). Mr. Yarbrough moved to suppress evidence seized during a protective sweep, statements made after the protective sweep, and evidence seized during a second search to which he had consented. (Docs. 12, 22). The magistrate judge held an evidentiary hearing on that motion. (Docs. 12, 22). After the evidentiary hearing, the magistrate judge entered a report and recommendation, recommending that the court deny Mr. Yarbrough's motion. (Doc. 21). Mr. Yarbrough filed objections to the report and recommendation. (Doc. 23).

The court reviews a magistrate judge's report and recommendation according to the Federal Magistrates Act, which provides: "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). This court has reviewed the full transcript of the hearing and all exhibits in the record, in addition to the report and recommendation, and briefing from both parties. For the reasons stated below, in view of the serious Fourth Amendment rights at stake, the court finds that the Government did not overcome the presumption that the warrantless search violated the Constitution. So the court hereby REJECTS the magistrate judge's report and recommendation. The court WILL GRANT Mr. Yarbrough's motion to suppress the evidence and the statements.

## I.     BACKGROUND

### 1. *Evidentiary Hearing*

At the evidentiary hearing, two Cherokee County Sheriff's Office investigators, Thomas Monroy and Matthew Sims, testified on behalf of the Government. (Doc. 22 at 4–5, 49).

Mr. Yarbrough's mother, Linda Yarbrough, and John Jennings, witnesses to the arrest of Mr. Yarbrough and the search and seizure of evidence from his house, testified on behalf of the defense. (*Id.* at 62–63, 67). The court will describe in detail their testimony and the other evidence submitted before addressing the magistrate judge's factual findings.

Investigator Monroy testified that he began investigating Mr. Yarbrough because of anonymous tips that the Sheriff's Office received. (*Id.* at 5–6). According to Investigator Monroy, the anonymous tips informed the Sheriff's Office that "[t]here was lots of activity at [Mr. Yarbrough's] house." (*Id.* at 6). When the magistrate judge asked Investigator Monroy "[w]hat was the nature of the criminal activity that was described," he responded "[p]ossible drug activity," (*id.* at 32), and that "a lot of [the tips] just say a lot of traffic, lot of traffic in and out." (*Id.* at 33). The tips did not mention guns or give any specifics about the number of people that might be involved in any activity at the house. (*Id.* at 32–33). Investigator Monroy also testified that he had no "belief that those anonymous tips were verified or truthful at that time." (*Id.* at 6).

Investigator Monroy ran a records check on Mr. Yarbrough and found outstanding warrants for the arrest of Mr. Yarbrough and his wife, Shelly Yarbrough. (*Id.* at 6, 11). Investigator Monroy did not testify about the nature of the warrants, although the Government asserted (without evidence) in response to the motion to suppress that the warrant for Mr. Yarbrough's arrest "was issued in relation to a bond revocation for use/possession of drug paraphernalia and possession/receipt of a controlled substance." (Doc. 20 at 1). Investigator Monroy went by Mr. Yarbrough's house "a couple of times to serve the warrant on him, and had verified that that was his place." (Doc. 22 at 6). But Mr. Yarbrough was not home on those occasions. (*Id.*).

Then, on August 31, 2016, an "anonymous neighbor[ ]" sent a text message saying that Mr. Yarbrough was home, "that everybody was there and he was there." (*Id.* at 7). The text message did not give any details about how many people would be at the house. (*Id.* at 32). Based on that text message, Investigator Monroy, Investigator Sims, and Officer Tyler Perea headed to Mr. Yarbrough's house to serve the arrest warrants. (*Id.* at 7–8, 40–41, 43).

According to a dispatch log, Investigator Monroy and Investigator Sims arrived at Mr. Yarbrough's house at 5:53 pm. (*Id.* at 33, 41–42; Doc. 24-1 at 1). They found Mr. Yarbrough and two other men standing around a pickup truck, with another vehicle parked nearby. (Doc. 22 at 9–11, 51). Mr. Jennings confirmed that he, Mr. Yarbrough, and a man named Bobby were standing near two trucks in Mr. Yarbrough's yard when the investigators arrived. (*Id.* at 63–64). Investigator Monroy testified that he knew Mr. Yarbrough owned one of the trucks and that the other two men in the yard told him that the other vehicle belonged to them. (*Id.* at 31).

According to Investigator Monroy's testimony, immediately after arriving at Mr. Yarbrough's house, the investigators placed handcuffs on all three men in the yard, who were compliant. (*Id.* at 10, 19). The investigators patted them down and did not find any weapons or contraband. (*Id.*). Investigator Monroy then asked Mr. Yarbrough if his wife was in the home, to which Mr. Yarbrough responded that she was. (*Id.* at 21).

Investigator Monroy approached the house to execute the arrest warrant on Mrs. Yarbrough. (Doc. 22 at 11). He found the front door open but the screen door closed. (*Id.*). From outside the screen door, he announced that he was from the Sheriff's Office and "hollered" Mrs. Yarbrough's name. (*Id.* at 11–12). He then saw Mrs. Yarbrough run from one part of the house into another room, which he later discovered was the bathroom. (*Id.* at 12–13).

She closed the door behind her, which Investigator Monroy testified was often a sign of "[h]iding or trying to get rid of other evidence such as narcotics evidence." (*Id.* at 13). But he testified that he did not hear the toilet flush. (*Id.* at 23).

Investigator Monroy entered the house and then the bathroom and placed Mrs. Yarbrough under arrest. (*Id.* at 13–14). No one asked Investigator Monroy whether he found any contraband or weapons on Mrs. Yarbrough or in the bathroom, and he did not testify that he found or saw anything. (*See generally id.* at 23). He then walked her back outside to the porch of the house and left her with Investigator Sims, Mr. Yarbrough, and the two other men. (*Id.* at 14). Investigator Monroy "immediately" reentered the house to do a protective sweep. (*Id.* at 43). He explained that doing a protective sweep alone is "not as safe," and "[y]ou would always want at least two people," but although "one person clearing the house is not the greatest thing to do, [ ] sometimes you have to." (*Id.* at 16).

Investigator Monroy testified that the protective sweep took "less than" one minute. (*Id.* at 31). He testified that he did not know if anyone else was in the house. (*Id.* at 15). But when the prosecuting attorney asked him if he thought "that someone could possibly be inside the home still," he answered, "Yes." (*Id.*). He also testified, however, that he had neither seen nor heard any other people in the house. (*Id.* at 23–25). During the sweep, he saw two shotguns in the corner of the master bedroom and an open Altoids tin holding a baggie containing a crystal-like substance. (*Id.* at 15). He seized and secured the guns but left the Altoids tin where it was. (*Id.* at 15–16).

While Investigator Monroy did the protective sweep, Investigator Sims had Mr. and Mrs. Yarbrough, Mr. Jennings, and Bobby detained outside. (Doc. 22 at 64–65). Mr. Jennings and Investigator Sims testified that they saw Investigator Monroy leave the house with the guns.

(*Id.* at 54, 65). And Mr. Jennings testified that at some point, he heard Mr. Yarbrough tell the police "something about the—that he didn't care if they did look or something, but I don't know—I didn't hear that part." (*Id.* at 65).

The court pauses here to address the timing of these events, which is unclear. The investigators arrived at the house at 5:53 pm. (Doc. 24-1 at 1). Two minutes later, at 5:55 pm, Investigator Monroy radioed Officer Perea, who was still on his way to the house: "We've got suspects in custody, you can slow down." (Stipulated Exh. 2 at 1:10–1:19). At the evidentiary hearing, Investigator Monroy testified that by the time of the 5:55 pm dispatch call, he had both Yarbroughs in custody. (Doc. 22 at 76). Then, at 5:58 pm, Investigator Monroy announced, "1027 times four," and he began reading identifying information about the suspects, including Mrs. Yarbrough, to dispatch. (Stipulated Exh. 2 at 1:27–2:33). But no one mentioned the discovery or seizure of the shotguns to dispatch until 6:38 pm. (*Id.* at 4:38–4:42). No one at the evidentiary hearing addressed when Investigator Monroy conducted the protective sweep between these dispatch calls.

In any event, sometime after the protective sweep, the investigators let Mr. Jennings and Bobby leave. (Doc. 22 at 65). Mr. Jennings went to Mr. Yarbrough's mother's house and told her that the officers had arrested Mr. Yarbrough. (*Id.* at 65, 67). Mr. Yarbrough's mother then went over to his house, where she saw the guns lying on the bed of a truck. (*Id.* at 67–68). She sat on the porch with the Yarbroughs while the investigators sought consent to search the house. (*Id.* at 71). She testified that the investigators told the Yarbroughs that if they did not consent to search the house, "they would tear it up and stuff like that." (*Id.* at 68). Investigator Monroy denied saying anything along those lines. (*Id.* at 74).

At 6:40 pm, the Yarbroughs signed a consent form permitting the investigators to search their house and property. (*Id.* at 48; *see also* Evidentiary Hearing Gov't Exh. 1). Investigator Sims testified that he took Mr. Yarbrough's handcuffs off to allow him to sign the consent form, but the record contains no testimony about whether Mrs. Yarbrough was handcuffed. (Doc. 22 at 62).

According to Mr. Yarbrough's motion to suppress, during the second search—the one conducted *after* the Yarbroughs consented—the investigators found and seized the Altoids tin from the bedroom, plus three glass pipes, scales, a clear plastic bag holding a crystal-like substance, and a false Pepsi can containing a spoon. (Doc. 12 at 3). Mr. Yarbrough denied ownership of the Altoids tin but admitted that he owned the shotguns found during the initial sweep. (*Id.*). Like much of the timing in this case, whether Mr. Yarbrough made those statements before or after consenting to the search is unclear.

### 2. *Magistrate Judge's Factual Findings and Credibility Determinations*

In his report and recommendation, the magistrate judge made some factual findings and credibility determinations. The court "may accept, reject, or modify, in whole or part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If a party objects to certain factual findings, the court reviews *de novo* those factual findings, *id.*; but if the party does not object to specific factual findings, the court reviews them only for clear error. *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993); *Doe v. Univ. of Alabama in Huntsville*, 177 F. Supp. 3d 1380, 1383–34 (N.D. Ala. 2016).

The witnesses at the evidentiary hearing agreed about most of what happened at Mr. Yarbrough's house on the day of the searches, and for the most part, the report and

recommendation faithfully recites the uncontested testimony. The magistrate judge made only a few explicit factual findings or credibility determinations:

1) The anonymous tips informed law enforcement officials that "the defendant's residence exhibited 'lots of' drug activity and traffic." (Doc. 21 at 1, 8–9).

2) The Yarbroughs gave verbal consent for a search of their home at some point after they were arrested. (Doc. 21 at 3).

3) Investigator Monroy completed the protective sweep before making the 5:55 pm radio dispatch indicating that he had suspects in custody. (Doc. 21 at 9).

4) "[N]o basis to mar [Investigator Sims's and Monroy's] credibility as to the Yarbrough's consent" existed. (Doc. 21 at 14).

5) Investigator Monroy conducted the protective sweep "for the [investigators'] safety, not to conduct a thorough search." (Doc. 21 at 16).

Mr. Yarbrough, the only party to file objections to the report and recommendation, objected to only two of the magistrate judge's factual findings. First, he objected to the finding that Investigator Monroy completed the protective sweep before making the 5:55 pm dispatch call. (Doc. 23 at 4 n.1). The court sustains that objection.

The court finds that Investigator Monroy could not have completed the protective sweep before making the 5:55 pm dispatch call. The dispatch log and recording are clear: the investigators arrived at the house at 5:53 pm and two minutes later, at 5:55 pm, Investigator Monroy radioed Officer Perea to say: "We've got suspects in custody, you can slow down." (Stipulated Exh. 2 at 1:10–1:19). According to Investigator Monroy's testimony, by the time he made that 5:55 pm call, he had already entered the house, arrested Mrs. Yarbrough, and taken her out to the yard. (*See* Doc. 22 at 76). And that testimony is bolstered by the fact that at 5:58 pm, Investigator Monroy began reading identifying information about Mr. and Mrs. Yarbrough to dispatch, indicating that he had her in custody long enough to gather that identifying information. (*See* Stipulated Exh. 2 at 1:27–2:33).

If Investigator Monroy had completed the protective sweep before making the 5:55 pm call to dispatch, then he would have had to park at 5:53 pm, get out of the car, handcuff and pat down the three men in the yard, question Mr. Yarbrough about Mrs. Yarbrough's location, go to the house and announce himself, see Mrs. Yarbrough run into another room, enter the house and then the bathroom, arrest and handcuff Mrs. Yarbrough, take her outside, return to the house, conduct the protective sweep, find and unload the shotguns, and remove them from the house, all within two minutes. The court finds that Investigator Monroy did not have time to do all of those things in that time frame. Instead, the court finds it more likely that Investigator Monroy did the protective sweep between 5:55 pm, when he radioed Officer Perea, and 5:58 pm.

Mr. Yarbrough's second objection addresses the magistrate judge's finding that the anonymous tips alleged "lots of" drug activity and traffic at Mr. Yarbrough's house. The court agrees with the magistrate judge that the anonymous tips alleged "lots of" *traffic* at the house. (Doc. 22 at 6, 32–33). But evidence does not support the finding that the tips alleged that "lots of" *drug activity* took place there.

The sum total of the testimony about the content of the anonymous tips came from Investigator Monroy, who testified that the tips alleged that "[t]here was lots of activity at [Mr. Yarbrough's] house," (*id.* at 6), and that "a lot of [the tips] just say a lot of traffic, lot of traffic in and out," (*id.* at 33). When the magistrate judge asked him, "What was the nature of the criminal activity that was described in those [tips]," Investigator Monroy responded, "Possible drug activity," (*id.* at 32). At no point did Investigator Monroy or anyone else testify that the tips alleged "lots of" *drug* activity at Mr. Yarbrough's home. Accordingly, the court sustains Mr. Yarbrough's objection to that factual finding, and instead finds that the anonymous

tips, which Investigator Monroy testified were unverified, alleged a lot of traffic in and out of Mr. Yarbrough's house, which *might* indicate drug activity taking place there.

As to the remaining factual findings, the court finds that the magistrate judge did not clearly err. The court accepts that the Yarbroughs verbally consented to the search of their home at some point after they were arrested and that Investigators Sims and Monroy were credible.

The court notes that the magistrate judge also "accept[ed] Investigator Monroy's testimony that he entered the residence briefly for the deputies' safety, not to conduct a thorough search, and Investigator Monroy did not conduct the sweep flagrantly." (Doc. 21 at 16). However, the court stresses that Investigator Monroy was never asked and never testified about *why* he conducted the search; he testified only about *how* he conducted the search. (*See generally* Doc. 22 at 5–49). Nevertheless, the court cannot say that the magistrate judge clearly erred in drawing the *inference* that Investigator Monroy's intent was to protect the safety of the investigators; indeed, courts have recognized that protective sweeps may be appropriate for officer safety. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) ("A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."). The court accepts that inference, but not that Investigator Monroy so testified.

## II.    ANALYSIS

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). Two narrow exceptions to that rule are relevant in this case. The first exception permits law enforcement officers to conduct a protective sweep of the premises without a warrant "to protect the safety of police officers or others." *Buie*, 494 U.S. at 327. The second exception permits law enforcement

officers to enter and search after obtaining "the voluntary consent of an individual possessing authority" to give consent. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). The court will address each exception in turn, keeping in mind that "the burden of proving an exception to the warrant requirement lies with the Government." *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002).

 1. *Protective Sweep*

A protective sweep is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie*, 494 U.S. at 327. A protective sweep does not violate the Fourth Amendment when the searching officer "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing . . . that the area swept harbored an individual posing a danger to the officer or others." *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983)) (alterations in original) (citation omitted). The Supreme Court explained that the officers must have had an "individualized, reasonable suspicion" that an individual posing a danger may be in the area to be searched. *Id.* at 334 n.2. The standard is an objective one: the officer must actually "*possess*[ ] a reasonable belief . . . that the area swept harbor[s] an individual posing a danger." *Id.* at 327 (emphasis added); *see also United States v. Williams*, 871 F.3d 1197, 1201 (11th Cir. 2017) (stating that, to conduct a permissible protective sweep, "*officers* must *have* at least a reasonable suspicion of the presence of dangerous individuals") (emphases added). In other words, a generalized suspicion articulated after the fact by the prosecutor cannot legitimize a warrantless search.

a.   The Shotguns

The court finds that the Government has not met its burden of proving that Investigator Monroy actually possessed a reasonable belief that (1) someone else was inside the Yarbrough home and (2) that person or persons posed a danger to him or others.  Neither Investigator Monroy nor Investigator Sims testified that they *actually believed* anyone other than Mrs. Yarbrough was inside the house, dangerous or not.  The closest either came was Investigator Monroy's testimony agreeing with the prosecuting attorney's suggestion that "someone could possibly be inside the home still."  (Doc. 22 at 15).

But someone could "possibly be" inside any home at any time.  If that were the standard for permitting a protective sweep, police would always be permitted to enter and search homes.  Along the same lines, police may not conduct a protective sweep every time they arrest a suspect.  If an arrest were the only prerequisite for a protective sweep, the Supreme Court would not have required police to have an individualized, reasonable suspicion that a person posing a danger was present.  *See Buie*, 494 U.S. at 327.  Those requirements would be superfluous.

And the Eleventh Circuit has explained that "in the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep."  *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999).  That requirement makes sense, because the Government carries the burden to *prove* that an exception applies to the presumption that warrantless searches and seizures violate the Fourth Amendment.  *See Holloway*, 290 F.3d at 1337.

The court also finds that Investigator Monroy did not actually believe anyone besides Mrs. Yarbrough was inside the house because, after he arrested and removed her from the home

but before he reentered the home to do the protective sweep, he called Officer Perea and told him, "We've got suspects in custody, you can slow down." (Stipulated Exh. 2 at 1:10–1:19). The court does not believe that Investigator Monroy would have told Officer Perea to slow down if he had believed that someone dangerous was hiding in the house. *Cf. United States v. Caraballo*, 595 F.3d 1214, 1225 (11th Cir. 2010) (holding the protective sweep permissible where, among other things, the searching officer "called for back-up from other law enforcement officers because the suspects' conduct made him nervous, and, notably, he did not board the vessel to conduct a search until back-up arrived").

The court emphasizes that it is *not* finding that Investigator Monroy's second entrance alone into the house evidences that he did not believe someone dangerous was inside. If the investigator actually believed that someone who posed a danger was inside the house, he may have entered it before Officer Perea arrived because of a belief that it was necessary to find and secure that person. But the court is convinced that, even if Investigator Monroy had felt he had to enter the house alone to conduct the protective sweep, he would not have paused to tell Officer Perea to slow down; he would have wanted Officer Perea there as soon as possible, even if he had to enter the house alone in the meantime. After all, as Investigator Monroy testified, "one person clearing the house is not the greatest thing to do, but sometimes you have to." (Doc. 22 at 16).

Even if Investigator Monroy's testimony agreeing with the prosecuting attorney that "someone could possibly be inside the home still" showed an actual belief that someone else inside the home posed a danger to him or others, the court finds that belief objectively unreasonable. The Government contends that it was a reasonable suspicion because: (1) the two vehicles were parked outside the home; (2) the warrants were for Mr. Yarbrough's arrest on drug

charges; (3) Mr. Jennings and Bobby were present outside the home; (4) Mrs. Yarbrough ran when Investigator Monroy announced himself; and (5) the anonymous tips purportedly related to suspected drug activity at the home. (Doc. 20 at 3). But the court notes, initially, that, at the evidentiary hearing, Investigator Monroy did not identify *any* of those circumstances as a basis for the protective sweep; they are the reasons that the prosecuting attorney offers as after-the-fact justifications for the search.

And although those after-the-fact justifications are "specific and articulable facts," they do not "reasonably warrant[ ] the officer in believing . . . that the area swept harbor[s] an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327. Whether the presence of the two vehicles outside the home could give rise to a reasonable suspicion that dangerous people were hiding in the house is a close call. The Eleventh Circuit has upheld protective sweeps where the *officers* (not the attorney later) pointed to multiple cars outside the home as one of the bases for believing that someone inside the home might pose a danger. *See Williams*, 871 F.3d at 1200, 1202 (holding a protective sweep was justified because officers saw three cars outside the house, one of which belonged to the defendant, *and* could hear "what sounded to them like a metal drug compressor"); *United States v. Bervaldi*, 226 F.3d 1256, 1258, 1268 (11th Cir. 2000) (holding a protective sweep was justified because police saw two trucks and a boat trailer outside the house, *and* found someone other than the arrestee inside near a cocked but unloaded pistol); *United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) (en banc) (holding a protective sweep was justified because three vehicles were parked outside the home *and* the officers knew that one of the suspects was lying about the presence of the other suspect inside the house).

In each of those cases, however, circumstances other than just two vehicles bolstered the officers' belief that someone else was inside the home. In *Williams*, the defendant whose residence FBI agents searched had already been indicted along with 24 other individuals. 871 F.3d at 1200. Agents surveilling the home saw the defendant and a co-conspirator leaving the home and heard what sounded like a metal drug compressor running. *Id.* When the agents returned to the home to make the arrest, they saw the defendant's car and two other vehicles parked outside. *Id.* The Eleventh Circuit explained that, *in addition to the cars outside the home*, the layout of the property and the "noise indicating drug distribution activities might be occurring on the property . . . suggested that there may be more people present on the premises . . . who could pose a threat to the arresting agents' safety." *Id.* at 1202.

In *Bervaldi*, police officers entered the defendant's home to execute an arrest warrant on him. 226 F.3d at 1258. The defendant, whom the officers did not recognize because of the dark lighting and a change in hair style, answered the door, acting in a manner that made one officer think he might be armed. *Id.* After officers forced their way into the home, they saw a cocked, unloaded pistol near the door. *Id.* The Eleventh Circuit held that those circumstances were sufficient to justify a protective sweep. *Id.* at 1268. Finally, in *Tobin*, the en banc Eleventh Circuit held that a protective sweep was justified where the officers saw three vehicles outside the house and *knew* that one of the people in the home was lying about the presence of another person in the house. 923 F.2d at 1513.

The court concludes that, under the circumstances of this case, the presence of two vehicles, the owners of which were in custody and compliant, is not enough to give rise to reasonable suspicion that dangerous individuals were hiding in the house. Investigator Monroy testified that he knew one of the vehicles belonged to Mr. Yarbrough, and that Mr. Jennings and

Bobby had told him that the other vehicle belonged to them. (Doc. 22 at 31). Neither investigator expressed any doubt that Mr. Jennings and Bobby were telling the truth.

But the court must consider whether the presence of the two vehicles in conjunction with the other facts on which the Government relies justify the search: Mr. Yarbrough's arrest warrants on drug charges; the presence of Mr. Jennings and Bobby outside the house; Mrs. Yarbrough's fleeing when Investigator Monroy announced himself; and the anonymous tips. The court concludes that, even combined, those circumstances do not give rise to a reasonable belief that someone dangerous was hiding in the Yarbroughs' home in light of further details known to investigators at the time.

The warrants for Mr. Yarbrough's arrest were, apparently, for "bond revocation for use/possession of drug paraphernalia and possession/receipt of a controlled substance." (Doc. 20 at 1). The court fails to see how those arrest warrants—for possession of drugs and drug paraphernalia, not for distribution or trafficking of drugs—would give rise to a belief that another person could be hiding in the house. As for the presence of Mr. Jennings and Bobby in the yard, both men were compliant with the investigators; neither was carrying any contraband or weapons; neither said anything that would give the investigators reason to think anyone besides Mrs. Yarbrough was in the house; and the investigators did not testify about having any doubts about their truthfulness. *Cf. Caraballo*, 595 F.3d at 1225 (holding a protective sweep was justified where, among other things, the three suspects gave inconsistent answers to the officer's questions and one of them appeared "extremely nervous"). Again, the court does not see how the mere presence of two compliant men in the yard of a house supports an inference or a reasonable suspicion that a *dangerous* person might be in the house, especially when those men were not carrying any contraband or weapons.

Likewise, the court finds that Mrs. Yarbrough's fleeing from one room to the other upon Investigator Monroy announcing himself does not give rise to a rational inference that someone else inside the home posed a danger. *See Buie*, 494 U.S. at 327. Investigator Monroy followed her into the bathroom, but he did not testify that he saw her try to grab any weapons or any other person; nor did he hear anyone else while he was in the house. (Doc. 22 at 23–24). In fact, he testified only that he believed she ran into the bathroom to attempt to hide or destroy contraband—none of which he found—not to attempt to find a weapon or alert a hidden person to his presence. (*Id.* at 13). And to the extent that he believed Mrs. Yarbrough herself might pose a danger, she ceased to pose any danger once he arrested her and removed her from the house.

Finally, the court rejects the suggestion that the anonymous tips provided a basis for the protective sweep. As the court already found, the anonymous tips alleged "lots of" *traffic*, which may indicate "[p]ossible drug activity" in the house. (Doc. 22 at 6, 32–33). The magistrate judge relied on the Eleventh Circuit's decision in *United States v. Hollis*, 780 F.3d 1064 (11th Cir. 2015) in arguing that the court should find that the officers were entitled to do a protective sweep because they suspected drug activity at the house. (Doc. 21 at 7–9).

In *Hollis*, the Eleventh Circuit approved a protective sweep where "[o]ne of the officers testified that he had been told that the apartment was a 'drug house,' with a 'high level of activity,' where 'people [were] in and out of the house all hours of the day or night,' and that [the officers] 'could expect to encounter a number of people inside.'" *Hollis*, 780 F.3d at 1069 (second alteration in original). The opinion does not identify the source of that information. *See generally* 780 F.3d 1064. But it does not indicate that the officers had any reason to *doubt* the specific information provided to them. *See generally id.*

By contrast, in this case, all the investigators had to rely on were vague anonymous tips that Investigator Monroy expressly admitted he had no reason to believe were true. (Doc. 22 at 6). And, as Mr. Yarbrough correctly argues, anonymous tips cannot give rise to reasonable suspicion sufficient to justify a warrantless search.

In *Florida v. J.L.*, the Supreme Court held that "an anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." 529 U.S. 266, 274 (2000). An anonymous tip alone does not justify a stop and frisk because "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Id.* at 270 (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)) (citation omitted). Sufficient indicia of reliability could include, for example, a tip that "accurately predicted the [subject]'s movements." *Id.* at 270–71.

The Government contends that *J.L.* does not apply in this case because this case does not involve a stop and frisk, but instead a protective sweep of a home. The court rejects that argument. The Supreme Court in *J.L.* drew from its decision in *Terry v. Ohio*, 392 U.S. 1 (1968), the seminal case holding that a police officer may, without probable cause, stop and frisk a suspect "where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' and not on a mere 'inchoate and unparticularized suspicion or 'hunch,'' 'that he is dealing with an armed and dangerous individual.'" *Buie*, 494 at 332 (quoting *Terry*, 392 U.S. at 21, 27) (citations omitted); *J.L.*, 529 U.S. at 269–70 (discussing *Terry*).

And the Supreme Court in *Buie*, the case that set out the standard for a constitutional protective search, also drew from *Terry*. The Court stated that the standard it set forth for protective sweeps was "no more and no less than was required in *Terry* and [*Michigan v. Long*, 463 U.S. 1032 (1983)], and as in those cases, we think this balance is the proper one." *Buie*, 494 U.S. at 334; *see also id.* at 335 n.2 ("*Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted. That approach is applied to the protective sweep of a house.").

And, in any event, the Eleventh Circuit has indicated that *J.L.* applies in cases involving a warrantless search of a home. In *United States v. Holloway*, an anonymous caller reported gunshots at the defendant's home. 290 F.3d 1331, 1338–39 (11th Cir. 2002). Based on that report, officers entered the home and searched it. *Id.* at 1338. The Eleventh Circuit stated, "we do not overlook the holding of [*J.L.*]," but it concluded that in an emergency situation, such as an anonymous report of gunshots fired in a house, "the need for immediate action may outweigh the need to verify the reliability of the caller." *Id.* at 1339.

The court concludes that *J.L.* prohibits a protective sweep based solely on anonymous tips that lack sufficient indicia of reliability. And these anonymous tips had no indicia of reliability. First, Investigator Monroy admitted that he had no "belief that those anonymous tips were verified or truthful at that time." (Doc. 22 at 6). Second, although Investigator Monroy stated that he drove by the Yarbroughs' home several times in an attempt to execute the warrants on them, he did not indicate that he saw a lot of traffic in and out of the house at that time, much less any indication of drug or other criminal activity, to validate the tips. And third, nothing that the investigators found at or in the home before Investigator Monroy did the protective sweep

corroborated the assertion of "lots of" traffic in and out of the home, or suggested drug activity there.

The court finds this case distinguishable from *Hollis*. Unlike that case, in which the police officers evidently had reason to trust *specific* information about the apartment being a drug house that was likely to have people inside it, in this case the officers had only vague, uncorroborated, anonymous tips alleging "lots of" traffic at the property.[1]

The court concludes that Investigator Monroy did not "possess[ ] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing . . . that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327. The court WILL GRANT Mr. Yarbrough's motion to suppress the shotguns and WILL SUPPRESS the two shotguns that were seized during the unconstitutional protective sweep.[2]

### b.  Mr. Yarbrough's Post-Arrest Statement

According to Mr. Yarbrough's motion to suppress, at some point after the protective sweep, he admitted to owning the two shotguns but denied owning the Altoids tin.  (Doc. 12 at 3).  The parties did not present any evidence about that statement at the evidentiary hearing or

---

[1] Mr. Yarbrough, pointing to the *record* in *Hollis*, notes a number of other distinctions between *Hollis* and this case.  (Doc. 23 at 15–18).  The court cannot consider those distinctions because the *Hollis* opinion does not discuss those portions of the record, and the Eleventh Circuit gave no indication it considered them relevant to its ruling.

[2] Mr. Yarbrough objects to what he views as the magistrate judge's finding that his consent, which he gave after the protective sweep, retroactively validated the seizure of the shotguns.  (Doc. 23 at 21–23).  The court OVERRULES that objection because the magistrate judge did not make that finding.  Instead, the magistrate judge found that the protective sweep was constitutional, permitting the seizure of the shotguns, and that the consent was voluntary, permitting the seizure of the other evidence found *after* the Yarbroughs consented to the second search.

elsewhere.  Assuming that Mr. Yarbrough did make that statement, like the shotguns, it must be suppressed.

"Under the so-called 'fruit of the poisonous tree' doctrine, admissions or confessions that the police induce by confronting a suspect with evidence obtained through an illegal search or seizure must be suppressed."  *United States v. Timmann*, 741 F.3d 1170, 1182 (11th Cir. 2013).  "The government bears the burden of demonstrating that evidence 'was not obtained as a direct result of the illegal search.'"  *Id.* (quoting *United States v. Crosby*, 739 F.2d 1542, 1549 (11th Cir. 1984)).

The court finds that the Government has not met its burden of proving that Mr. Yarbrough's statement admitting ownership of the guns but denying ownership of the Altoids tin "was not obtained as a direct result of" the illegal protective sweep.  *See id.*  Indeed, the Government presented no evidence on that question at all.

In addition, the uncontested evidence shows that Investigator Monroy removed the shotguns from the house and placed them in the bed of a truck in plain view of everyone in the yard, including Mr. Yarbrough, against whom they would undoubtedly be used as evidence. Placing evidence that was obtained from an illegal search of his home in his view and then questioning him about that evidence is a prime example of the reason for the fruit of the poisonous tree doctrine: deterrence of police misconduct.  *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963) (explaining that one of the main reasons for the fruit of the poisonous tree doctrine is to deter "lawless conduct" by law enforcement).  The court WILL SUPPRESS Mr. Yarbrough's statement.

*2. Consent*

The court's determination that the shotguns and Mr. Yarbrough's statement must be suppressed is not the end of the matter, because Mr. Yarbrough also moves to suppress other evidence found during the second search—the search conducted pursuant to the Yarbroughs' written consent. According to Mr. Yarbrough's motion to suppress, during that search, the investigators seized the Altoids tin from the bedroom, three glass pipes, scales, a clear plastic bag holding a crystal-like substance, and a false Pepsi can containing a spoon. (Doc. 12 at 3). The court is unsure what relevance any of that evidence could have in the government's case against Mr. Yarbrough, who faces only one charge of being a felon in possession of two firearms, in violation of 18 U.S.C. § 922(g)(1). Nevertheless, the court will address his motion to suppress that evidence.

"A search is reasonable and does not require a warrant if law enforcement obtain voluntary consent." *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017). "For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure." *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007) (quoting *United States v. Santa*, 236 F.3d 662, 676–77 (11th Cir. 2000)). "[T]he government bears the burden on both issues." *Id.*

The court declines to address whether the Yarbroughs voluntarily consented to the search because, even if they did, their consent was "a product of the illegal seizure" of the shotguns. *See Delancy*, 502 F.3d at 1308. Determining whether the consent was a product of an illegal seizure is "a fact-specific question, and no single fact is dispositive." *Id.* at 1309. But the Eleventh Circuit has generally focused on three factors, while acknowledging that others may exist: "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening

circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct." *Id.* (quoting *Santa*, 236 F.3d at 677) (alterations in original). Those are the only factors that the Government, which bears the burden of proving the unlawful search did not taint the consent, discussed in its opposition to the motion to suppress. (Doc. 20 at 8–9). So those are the only factors that the court will consider now.

First, the court finds that the temporal proximity of the illegal seizure of the shotguns and the consent weighs slightly in favor of exclusion. The Court has explained that "the more time that has elapsed between the illegal act and the defendant's consent, the more likely it is that the defendant's consent was untainted." *United States v. Smith*, 688 F.3d 730, 739 (11th Cir. 2012). As discussed above, Investigator Monroy likely completed the protective sweep between 5:55 and 5:58 pm, but he certainly did not begin the sweep before 5:55 pm. *See* supra at 8–9. He testified that he removed the shotguns from the house after completing the protective sweep, which took less than one minute. (Doc. 22 at 15–17, 31). The court finds that the earliest Investigator Monroy could have removed the guns was 5:56 pm. The Yarbroughs signed the consent form at 6:40 pm, 44 minutes later. (*Id.* at 48).

In many of the cases in which the Eleventh Circuit has found that the close temporal proximity indicated that the illegal seizure tainted the consent, the consent has followed mere minutes after the seizure. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) (three minutes between illegal stop and consent); *Santa*, 236 F.3d at 666–67 (two to three minutes between illegal entry and consent); *United States v. Robinson*, 690 F.2d 869, 878 (11th Cir. 1982) (eight minutes between illegal arrest and consent). By contrast, the Court has "suggested that a period of four days supports the conclusion that any taint from an illegal act is

'completely attenuated.'" *Smith*, 688 F.3d at 739 (quoting *Devier v. Zant*, 3 F.3d 1445, 1459 (11th Cir. 1993).

Although 44 minutes is longer than the two- to eight-minute delays discussed in the cases above, the court finds that the relatively short period of time weighs in favor of exclusion, especially in light of "the *character* of the interaction between the law enforcement agents and the defendant" during those 44 minutes. *See id.* (emphasis in original); *cf. Smith*, 688 F.3d at 740 (finding the time factor relatively unimportant in part because the officers' interaction with the defendant was not intrusive and "[a]t no point was Mr. Smith handcuffed or detained"); *Delancy*, 502 F.3d at 1311 (finding that a "relatively brief" period of 10 to 20 minutes between the illegal search and consent did not weigh in favor of exclusion because the defendant "was not handcuffed or detained," "the interaction was conversational in tone," and "the officers did not threaten [the person who consented] in any way").

During the 44 minutes here, the investigators had both Mr. and Mrs. Yarbrough handcuffed and under arrest, and, as in *Santa*, had just conducted an illegal search of their house and displayed the guns seized during that illegal search. *See Santa*, 236 F.3d at 666. Moreover, the interaction between the Yarbroughs and the officers was not "conversational in tone," as in *Delancy*. 502 F.3d at 1311. Mr. Yarbrough's mother testified that she heard the investigators tell the Yarbroughs that if they did not consent to a search of the house, "they would tear it up and stuff like that." (Doc. 22 at 68).

The second factor that the court considers is "the presence of intervening circumstances" between the illegal search and the consent. *See Delancy*, 502 F.3d at 1309. In *Delancy*, the Eleventh Circuit found that the defendant's "review and signing of the consent form, which served as a notification to [her] of her constitutional rights," was an "important" intervening

circumstance sufficient to remove any taint from the illegal search. *Id.* at 1311–12. As in *Delancy*, the Yarbroughs signed a written consent, indicating their understanding of their rights under the Fourth Amendment. But the court finds that, in this case, the written consent does not serve as an intervening circumstance sufficient to cleanse the taint of the illegal search and seizure because of the third factor, the "flagrancy of the official misconduct." *Id.* at 1309.

The court has accepted the magistrate judge's inference that Investigator Monroy's subjective intent in conducting the protective sweep was to protect the safety of the investigators. *See* supra at 10. Investigator Monroy did not do the protective sweep as a sham for a full-scale search or to gain the Yarbroughs' consent. Nevertheless, this factor weighs in favor of exclusion because Investigator Monroy placed the illegally seized shotguns in the Yarbroughs' plain sight while he was pursuing their consent to search the home and property.

In *Delancy*, the Eleventh Circuit noted that the officers' search was not flagrant in part because "there is no suggestion that the police *exploited the evidence* found prior to consent." 502 F.3d at 1313 (emphasis added). But the Court noted that "[i]f this had been a situation where [the person who consented] was 'face to face with the incriminating evidence [obtained by a prior illegal search] and able to see that the police had firm control over her home,' the consent may have been tainted." *Id.* (quoting *Holloway v. Wolff*, 482 F.2d 110, 115 (8th Cir. 1973)); *cf. United States v Welch*, 683 F.3d 1304, 1308 (11th Cir. 2012) ("When [police] enter unlawfully but mistakenly and in good faith, and when they obtain the knowing, intelligent, and voluntary consent of a third party *without exploiting their unlawful entry in any way*, the purposes of the exclusionary rule would not be served by excluding valuable evidence.") (alteration in original) (emphasis added) (quotation marks omitted).

Here we have exactly the problematic situation described in *Delancy*. Investigator Monroy removed the shotguns from the home in front of the Yarbroughs and placed them in the bed of a truck, in plain view of the Yarbroughs, while he sought their consent to search the home. Mr. Yarbrough was "face to face with the incriminating evidence" that he, a convicted felon, possessed two firearms. *See Delancy*, 502 F.3d at 1313. Although the court finds that Investigator Monroy did not act in bad faith, the illegal search and seizure resulted in the flagrant display of the irrefutable incriminating evidence against Mr. Yarbrough. The court cannot say that such irrefutable incriminating evidence on full display did not taint the voluntariness of the Yarbroughs' consent.

Considering the temporal proximity, the lack of intervening circumstances, and the flagrancy of the official conduct in this case, the court must conclude that the illegal search and seizure tainted the Yarbroughs' consent. The court sustains Mr. Yarbrough's objection to the magistrate judge's finding to the contrary. The court WILL GRANT Mr. Yarbrough's motion to suppress the evidence seized during the second search and WILL SUPPRESS that evidence.

## III.     CONCLUSION

For the reasons stated above, the court REJECTS the magistrate judge's report and recommendation, and WILL GRANT Mr. Yarbrough's motion to suppress the evidence found during both searches of his house and property, as well as his post-sweep statement. The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this 8th day of January, 2018.

_____

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE